McKenna, et al. v. American Institute CV-94-671-B   09/12/97

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Marsha A. McKenna and</u>
<u>James F. McKenna,</u>
<u>by and through his next</u>
<u>best friend, Marsha A. McKenna</u>

    v.                                                   Civil No. 94-671-B

<u>American Institute for Foreign</u>
<u>Study Scholarship Foundation and</u>
<u>American Institute of Foreign</u>
<u>Study, Inc.</u>

**<u>MEMORANDUM AND ORDER</u>**

Marsha McKenna and her son, James McKenna, brought this action to recover damages allegedly suffered by them due to a sexual assault committed by an au pair[1] placed in the McKenna household by the defendants. James McKenna asserts claims for (1) negligence, (2) negligent infliction of emotional distress, (3) breach of contract, (4) breach of express warranty, and (5) vicarious liability. Marsha McKenna claims (1) breach of contract, (2) breach of express warranty, (3) misrepresentation

---

[1] An "au pair" is a person, usually a young foreign visitor, employed to take care of children in exchange for room and board.

and (4) defamation.[2]  The defendants move for summary judgment on all counts.  For the following reasons, I grant their motion in part and deny it in part.


## I.  BACKGROUND

Defendants operate a program which, for a fee, brings foreign students to the United States and places them with American families as au pairs.  In the fall of 1992, the defendants sent Marsha McKenna a "Host Family Application" and a brochure explaining their business.[3]  Marsha McKenna informed defendants that she needed an au pair to help care for her son, James McKenna.  She also paid a $200 application fee, signed the "Host Family Agreement," which incorporates the brochure by reference, and paid defendants' $3,450 fee.

Defendants sent Marsha McKenna information about a Danish man named Mads Runge Lilholm, whom defendants had approved for

_____

[2]  On November 3, 1995, I dismissed plaintiffs' Consumer Protection Act, breach of implied warranty, strict liability, and vicarious liability based on joint enterprise claims; and Marsha McKenna's negligence and negligent infliction of emotional distress claims.  At the same time, I determined that all of plaintiffs' claims are governed by New Hampshire law.

[3]  Defendants' brochure states, among other things, that all au pairs will be "carefully selected," "screened," and "of good character."  It also states that defendants will provide au pairs with "an intensive four-day orientation and training program."

2

placement with the McKennas. The "Interview Report" that defendants sent Marsha McKenna states: "Mads is a wonderful young man with a love of children. . . . He is open and kind, and you can't help liking him; he will be a wonderful au pair." According to Marsha McKenna, she agreed to accept Lilholm as an au pair based on these representations.

Defendants placed Lilholm in the McKenna household in December 1992. The McKennas allege that on January 3, 1993, Lilholm sexually abused James, then five, by wrestling him to the ground, pulling down James's pants to expose his genitals, holding James down by grabbing him in the genital area, and then using or pretending to use a camera to photograph his genitals.

Despite Lilholm's warning not to do so, James told his father about the incident. When confronted by the McKennas and the police, Lilholm denied wrestling James to the ground or photographing his genitals, but admitted that, ostensibly to discipline James, he had threatened to do so.

When defendants confronted Lilholm, he claimed that Mrs. McKenna had concocted the story to punish Lilholm for rebuffing her sexual advances. Defendants repeated Lilholm's claim to another host family, Norman and Linda Shinkle, in an attempt to convince them to accept Lilholm. Specifically, the Shinkles

3

relate that the defendants told them that Lilholm had been serving as an au pair in New Hampshire, that the Host Mother had alleged that Lilholm acted improperly by taking photographs of her son for inappropriate purposes, and that Lilholm had denied the allegations, saying that the Host Mother had made up the allegations in retaliation for his rebuff of her sexual advances.

## II.   **STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The party opposing the motion, the McKennas in this case, must set forth specific facts showing that there remains a genuine issue for trial, demonstrating some factual disagreement sufficient to deflect summary disposition. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). This burden is discharged only if

4

the cited disagreement relates to a genuine issue of material fact. Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Stone & Michaud Ins., Inc. v. Bank Five for Sav., 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson, 477 U.S. at 249).

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must "make a showing suffi-cient to establish the existence of [the] element[s] essential to [his] case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). It is not sufficient to "rest upon mere allegation[s] or denials of his pleading." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, 477 U.S. at 256). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the nonmoving party." Id. at 842 (citations omitted). In determining whether summary judgment is appropriate, I construe the evidence and draw all justifiable inferences in the non-moving party's favor. Anderson, 477 U.S. at 255.

## III.   DISCUSSION

### A.   The Release

The defendants argue that the release contained in the "Host Family Agreement" signed by Marsha McKenna bars plaintiffs' claims.  The release reads:

> I acknowledge and agree to release the Foundation, American Institute for Foreign Study (the "Institute"), AIFS, Inc. and its subsidiaries and their officers, employees, and agents, for any personal and property damage, injury, loss, delay or expense incurred by me/us or any family member, guest, employee or agent, due to events beyond the Foundation's or Institute's reasonable control, including without limitation acts of God, acts of war or government restrictions, and, in the absence of gross or willful negligence by the Foundation or the Institute, any events directly or indirectly caused by any intentional or negligent acts or omissions by an au pair placed in my/our household.

In order to decide whether this release bars the McKennas' claims, I must determine (1) whether, under the circumstances, Marsha McKenna could release the defendants from liability as to her son's potential claims, (2) whether the language of the release bars any of the McKennas' claims, and (3) whether the release is valid under New Hampshire law.

The New Hampshire Supreme Court has never decided whether a parent has the legal authority to waive her child's future cause of action for personal injuries resulting from a third party's negligence.  It has, however, upheld release clauses or excul-

6

patory agreements against adults, finding that they are not per se violative of public policy. Barnes v. New Hampshire Karting Assoc., Inc., 128 N.H. 102, 106-08 (1986). In so doing, the court noted that "exculpatory contracts are generally prohibited," and that a "defendant seeking to avoid liability must show that the exculpatory agreement does not contravene public policy." Id. at 106. Thus, "[w]here the defendant is a common carrier, innkeeper or public utility, or is otherwise charged with a duty of public service, the defendant cannot by contract rid itself of its obligation of reasonable care." Id. (citations omitted). Likewise, exculpatory agreements may be invalid where one party is at an obvious disadvantage in bargaining power, and consequently cannot be said to have freely chosen to enter into the agreement. Id. at 107.

Even when an exculpatory agreement does not contravene public policy, it is to be strictly construed against the drafter to protect the basic tenet that a party should be liable for the consequences of its negligent breach of duty. Id. at 106-07. An exculpatory agreement will only be upheld if it clearly states that the defendant is not responsible for the consequences of his negligence and contemplates the plaintiff's claims against which it is asserted. Id. at 107. Additionally, the plaintiff's

7

claims must have been within the contemplation of the parties when the agreement was executed.  Id.

New Hampshire's Supreme Court has decided that a parent's decision to give up a child's cause of action in exchange for workers' compensation payments is not binding on the child under the Workers' Compensation Act.  Roberts v. Hillsborough Mills, 85 N.H. 517, 518-19 (1932).  In making its decision, the court noted that "[o]rdinarily there are only two recognized ways in which a minor may take binding action in the enforcement or discharge of his legal rights, namely, through a duly appointed guardian acting within his powers, or through his next friend by proceedings in court."  Id. at 519 (citations omitted).  This decision is in accordance with the general rule that, in post-injury settings, a parent's signature on a release is ineffective to preclude a minor's claims against a negligent party.  See, e.g., Colfer v. Royal Globe Ins. Co., 519 A.2d 893 (N.J. Super. Ct. App. Div. 1986); Castro v. Boulevard Hosp., 483 N.Y.S.2d 65 (N.Y. App. Div. 1984); Whitcomb v. Dancer, 443 A.2d 458 (Vt. 1982).

Since a parent may not release a child's cause of action post-injury without court approval, it makes little sense to conclude that the parent should have that authority before the injury occurs.  Scott v. Pacific W. Mtn. Resort, 834 P.2d 6, 11-

8

12 (Wash. 1992) (en banc). Accordingly, of those jurisdictions that have considered the issue, almost all have concluded that pre-injury releases signed by a parent do not bar a child's action for personal injury absent contrary statutory provisions. Fedor v. Mauwehu Coun., Boy Scouts of Am., Inc., 143 A.2d 466, 467-68 (Conn. Super. Ct. 1958); Meyer v. Naperville Manner, Inc., 634 N.E.2d 411, 414-15 (Ill. App. Ct. 1994); Doyle v. Bowdoin College, 403 A.2d 1206, 1208 n.3 (Me. 1979); Fitzgerald v. Newark Morning Ledger Co., 267 A.2d 557, 559 (N.J. Super. Ct. Law Div. 1970); Childress v. Madison County, 777 S.W.2d 1, 7 (Tenn. Ct. App. 1989); Scott, 834 P.2d at 10. See also International Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 214 (1991) (White, J. concurring). But see, Hohe v. San Diego Unified Sch. Dist., 224 Cal. App.3d 1559, 1564-65 (Cal. Ct. App. 1990).

Based on the holding in Roberts, New Hampshire's general public policy disfavoring exculpatory agreements, and the weight of authority from other jurisdictions, I conclude that the New Hampshire Supreme Court would hold that the pre-injury release signed by Marsha McKenna is unenforceable against her son's claims.

Having found that the release does not apply to James McKenna's claims, I now consider whether it applies to Marsha

9

McKenna's breach of contract, breach of express warranty, misrepresentation, and defamation claims. As an exculpatory agreement, I construe its language strictly against the defendants, who drafted it. Barnes, 128 N.H. at 107. If the agreement does not "clearly and specifically indicate[]" an intent to release the defendant from liability for personal injury caused by the defendant's negligence, it will not be enforced. Id.

The "Host Family Agreement" states that the defendants are only released for damages incurred "due to events beyond the Foundation's or Institute's reasonable control." Events beyond the defendants' reasonable control are defined as "events directly or indirectly caused by any intentional or negligent acts or omissions by an au pair placed in my/our household."

The agreement clearly releases the defendants from vicarious liability based on the acts or omissions of an au pair. It does not release claims such as Marsha McKenna's defamation claim which is based on the defendants' own conduct. Also, it is not clear that the agreement releases defendants from liability for the au pair's injurious acts to the extent that the defendants would otherwise be liable for those acts because of their own misconduct.

Marsha McKenna's remaining claims are all based on acts allegedly committed directly by the defendants. She argues that the defendants made misrepresentations, breached their contract, and broke their express warranties by not screening, training, or carefully selecting Lilholm. The damage allegedly inflicted by these acts was caused by Lilholm, but none of the acts themselves can be said to have been beyond the defendants' reasonable control. Thus, strictly construing the language of the exculpatory agreement against the defendants, I find that it does not clearly apply to Marsha McKenna's misrepresentation, breach of contract, and warranty claims.

Because I find that the terms of the exculpatory agreement are unclear, I need not examine whether it is otherwise contrary to public policy in order to conclude that the release does not bar Marsha McKenna's claims.

## B.   Marsha McKenna's Defamation Claim

Marsha McKenna alleges that she was defamed when the defendants repeated Lilholm's accusation that she had concocted the abuse allegations in response to his rebuff of her sexual advances.[4]  Defendants argue that the defamation count must be

---

[4]  In their brief opposing summary judgment, plaintiffs also seem to argue that the defendants are directly liable for Lilholm's defamatory statements based on the doctrine of

11

dismissed because it is undisputed that they never named Marsha McKenna when they repeated Lilholm's accusations and because their repetition was not a statement of fact, but a report of an allegation.  Defendants' arguments, which are presented without citation to any case or treatise, do not provide a reason to grant summary judgment.

To establish a case of defamation, McKenna must present evidence that the defendants "failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993) (citing Restatement (Second) of Torts § 558 (1977)).  A defamatory statement need not refer specifically to a plaintiff by name.  See, e.g., Hayes v. Newspapers of New Hampshire, Inc., 141 N.H. 464, 464-65 (1996). It is sufficient that the statement points to the plaintiff by description or circumstances tending to identify her.  Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985) (applying Pennsylvania law); Eyal v. Helen Broad. Corp., 583 N.E.2d 228,

respondeat superior.  The plaintiffs' complaint, however, only alleges defamation based on the defendants' repetition of Lilholm's statement to another prospective host family and only alleges vicarious liability for Lilholm's alleged acts of assault, not for his defamatory statements.

12

230-31 (Mass. 1991); 50 Am. Jur. 2d Libel and Slander § 29 (1995). Here, the defendants referred to Marsha McKenna by description, identifying her as Lilholm's Host Mother from New Hampshire. This information is sufficient for a jury to conclude that the defendants' statements were about Marsha McKenna, and thus can support her claim of defamation.[5]

Furthermore, every repetition of a defamatory statement is itself an actionable publication, "even though the repeater states the source, or resorts to the customary newspaper evasion 'it is alleged', or makes it clear that he does not himself believe the imputation." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 113, at 799 (5th ed. 1984)); see also Olinger v. American Sav. & Loan Ass'n, 409 F.2d 142, 144 (D.C. Cir. 1969); Maloof v. Post Publ'g Co., 28 N.E.2d 458, 459 (Mass. 1940); Martin v. Wilson Publ'g Co., 497 A.2d 322, 327 (R.I. 1985); Restatement (Second) of Torts § 581A cmt. e (1977). For these reasons, I deny defendants' motion for summary judgment as to Marsha McKenna's defamation count.

---

[5] Defendants do not argue that their allegedly defamatory statements did not harm Marsha McKenna's reputation because the Shinkles did not know her. Therefore, I do not decide here whether Marsha McKenna is entitled to any compensable damages for defamation. Nor do I decide whether her claims are subject to any privilege.

## C.    Marsha McKenna's Misrepresentation Claim

Marsha McKenna alleges that the defendants misrepresented in their brochure that their au pairs would be "of good character," would be carefully screened prior to selection, and would be provided with appropriate training.  She also alleges that the defendants misrepresented in their "interview report" of Lilholm that he was "a wonderful young man with a love of children," that he was "open and kind," and that he would be "a wonderful au pair."

To succeed with a claim of intentional misrepresentation, Marsha McKenna must show that the defendants' representations were made (1) with knowledge of their falsity or with conscious indifference to their truth and (2) with the intention of causing her to rely on the representations.[6]  Patch v. Arsenault, 139 N.H. 313, 319 (1995).

Mrs. McKenna has presented no evidence and does not now argue that the defendants knew their statements were false. Instead, she asserts that because the defendants failed to exercise reasonable care to verify the truth of their statements,

---

[6]  Marsha McKenna does not assert a negligent misrepresentation claim as her complaint alleges that defendants acted either with knowledge that the representations were false or with reckless disregard of the statement's truth or falsity.  See Patch v. Arsenault, 139 N.H. 313, 319-20 (1995).

14

they acted with reckless disregard of or conscious indifference to the statements' truth or falsity. Conscious disregard, however, requires more than a mere failure to investigate. See Nash v. Keene Publ'g Corp., 127 N.H. 214, 223 (1985) ("Failure to investigate does not in itself establish bad faith."). To establish a reckless disregard to the truth or falsity of a statement, a plaintiff must present proof of a high degree of awareness of probable falsity or evidence sufficient to permit the conclusion that the defendants in fact entertained serious doubts as to the truth of their statements. Id. (explaining the meaning of reckless disregard in a defamation action).

McKenna has presented no evidence which suggests that the defendants knew anything that called into question their assertions that Lilholm was of good character, had a love of children, was open and kind, or would be a wonderful au pair.[7] Nor does the record contain evidence indicating that the defendants did not intend to screen or train Lilholm. It is undisputed that the defendants interviewed Lilholm and checked at least one of his

_____

[7] The McKennas present testimony from an expert who claims that the defendants should have recognized a need for additional information and further scrutiny of Lilholm. However, no reasonable jury could conclude from this evidence that the defendants in fact entertained serious doubts as to the truth of their statements about Lilholm's character.

15

references.  As far as training is concerned, Mrs. McKenna concedes that she was aware that Lilholm would not attend the training session in New York.  In fact, Mrs. McKenna requested that Lilholm travel directly to New Hampshire and not attend the New York training session.  It is undisputed that Lilholm received one-on-one training from the Institute's community counselor after his arrival in New Hampshire.  Based on this undisputed evidence, no reasonable jury could conclude that the defendants made their alleged misrepresentations with a conscious indifference to or a reckless disregard of their truth or falsity.  Nor will the record support a claim that the defendants made promises without the intent or ability to carry them out. See Hydraform Prods. Corp. v. American Steel & Aluminum Corp., 127 N.H. 187, 201 (1985).  For this reason, I grant defendants' motion for summary judgment as to Marsha McKenna's misrepresentation counts.

D.   **Plaintiffs' Claims for Breach of Contract
     and Breach of Warranty**

Defendants move for summary judgment on plaintiffs' breach of contract and breach of express warranty claims,[8] asserting

---

[8]  In my order of November 3, 1995, I held that the breach of express warranty and contract claims, though similar, were not identical.

16

that any damages recoverable by the plaintiffs have already been paid in the form of a refund of Mrs. McKenna's $3,450 fee. The McKennas counter by claiming that a genuine factual dispute exists as to whether additional consequential damages are recoverable. Consequential damages are those damages that "could have been reasonably anticipated by the parties as likely to be caused by the defendant[s'] breach." Zareas v. Smith, 119 N.H. 534, 538 (1979) (quoting Hurd v. Dinsmore, 63 N.H. 171, 174 (1884)). Put another way, consequential damages must flow from the defendants' breach of contract in "the natural course of events." Salem Eng'g and Constr. Corp. v. Londonderry Sch. Dist., 122 N.H. 379, 383-84 (1982). The "scope of 'foreseeable,' and therefore recoverable, damages is narrower in a contract case than in tort." Zareas, 119 N.H. at 538. As in tort cases, however, the foreseeability of consequential damages in contract cases ultimately is a question of fact for the jury. Jarvis v. Prudential Ins. Co. of Am., 122 N.H. 648, 654 (1982).

Here, the McKennas seek consequential damages for the time and expense of searching for another caretaker for James and the time and expense of arranging James's counseling.[9] Mrs. McKenna

---

[9] The McKennas do not seek damages for emotional distress under these counts. See Crowley v. Global Realty, Inc. 124 N.H. 814, 817 (1984) ("[R]ecovery of damages for mental suffering and

17

asserts that she specifically informed the defendants of her urgent need for childcare upon her return to school. Thus, a jury could conclude that the defendants "had reason to know the facts and to foresee the injury" that could result from their breach of contract. Emery v. Caledonia Sand & Gravel Co., 117 N.H. 441, 446 (1977) (quoting Johnson v. Waisman Bros., 93 N.H. 133, 135 (1944)). In addition, a reasonable jury could find that the expenses of searching for a caretaker and arranging for a counselor for James qualify as foreseeable damages flowing from the defendants' alleged failure to provide a qualified au pair "of good character" to the McKennas. Therefore, I deny defendants' motion for summary judgment on the plaintiffs' breach of contract and breach of warranty counts.

## E. James McKenna's Claim for Vicarious Liability

The defendants argue that they cannot be held vicariously liable for any alleged abuse committed by Lilholm because he was not their agent or employee, or that, in the alternative, his intentional acts were outside the scope of his employment.

The terms "employer" and "employee" are terms of art under the doctrine of respondeat superior. To determine whether a

---

emotional distress is not generally permitted in actions arising out of breach of contract.").

person is an "employee" for the purposes of the respondeat superior doctrine, the New Hampshire Supreme Court examines the totality of the circumstances, asking "'whether on all the facts the community would consider the person an employee.'" Boissonnault v. Bristol Federated Church, 138 N.H. 476, 478 (1994) (quoting Hunter v. R.G. Watkins & Son, Inc., 110 N.H. 243, 246 (1970)). It is not necessary for Lilholm to have been paid by the defendants in order to be deemed their employee for respondeat superior liability. See id. (volunteers may be employees for purposes of respondeat superior). An employer's control over the alleged employee is a significant factor to consider, but a defendant need not have controlled the "manner and the means of the performance of the work in order for the doctrine to come into play." Boissonnault, 138 N.H. at 478.

In this case, the McKennas have presented evidence that the defendants selected Lilholm, matched him with their family, were responsible for training him, and provided a community counselor to supervise and aid Lilholm throughout the year. In addition, the defendants' contract with Marsha McKenna set the terms of Lilholm's employment, how many hours Lilholm would work per week, how much and often Lilholm would be paid, and how much vacation Lilholm would have. If defendants decided that the McKennas were

19

not abiding by their requirements, they had the power to remove Lilholm from the McKennas' home without paying a refund.  The McKennas did not have the reciprocal power to fire Lilholm if he performed unsatisfactorily.  Rather, in order to dismiss Lilholm, the McKennas had to follow specific procedures established by the defendants.  These factors, taken together, and weighed in the light most favorable to the McKennas, are sufficient to demonstrate that Lilholm was the defendants' employee for the purposes of respondeat superior liability.

Even if Lilholm was an employee of the defendants, however, respondeat superior liability will be unavailable if Lilholm did not commit his tortious acts incidental to or during the scope of his employment.  See Trahan-Laroche v. Lockheed Sanders, Inc., 139 N.H. 483, 485 (1995).  Behavior within the scope of employment "must be actuated at least in part by an object to serve the employer."  Daigle v. City of Portsmouth, 129 N.H. 561, 580 (1987) (citing Restatement (Second) of Agency § 228(1)(c) (1958)).  Outrageous acts or inflictions of punishment out of proportion to the necessities of an employer's business needs are evidence that the employee departed from the scope of employment, and instead acted for purely personal reasons.  Restatement (Second) of Agency § 245 cmt. f (1958).

20

An outrageous act, however, is not conclusive of whether an employee is acting within his scope of employment.  An employee acting with a dual or misguided purpose to serve his employer may subject his employer to liability.  Maddex v. Ricca, 258 F. Supp. 352, 358 (D. Ariz. 1966); Sunseri v. Puccia, 422 N.E.2d 925, 930 (Ill. App. Ct. 1981); Prosser, supra, § 70 at 502-05.  An employee's motivation is normally a question of fact for the jury.  See Trahan-Laroche, 139 N.H. at 485; see also, Smith v. American Express Travel Related Servs. Co., 876 P.2d 1166, 1171 (Ariz. Ct. App. 1994); John R. v. Oakland Unified Sch. Dist., 769 P.2d 948, 953 (Cal. 1989); Sunseri, 422 N.E.2d at 930; Birkner v. Salt Lake County, 771 P.2d 1053, 1057 (Utah 1989).

In this case, a reasonable jury could find either that Lilholm sexually assaulted James McKenna, an act that would most likely be beyond his scope of employment as a matter of law, see, e.g., Smith, 876 P.2d at 1171, or that Lilholm did not abuse James, but did threaten to remove his pants and photograph his genitals in an improper effort to discipline him.[10]  Under the

---

[10]  According to Lilholm, James had made an attempt to pull down Lilholm's pants.  Despite Lilholm's warnings to James not to do it again, James persisted.  Eventually, Lilholm asserts that he grabbed a camera and threatened James by saying if he did it one more time, Lilholm would take a picture of him and put it in a magazine.  James again tried to pull down Lilholm's pants, at which time, Lilholm pulled down James's pants and pretended to

latter scenario, Lilholm could be found to have been acting within the scope of his employment. Because this factual dispute potentially leads to two different conclusions as to whether Lilholm's acts were within the scope of his employment, I deny defendants' motion for summary judgment as to James McKenna's claims for vicarious liability.[11]

## F. James McKenna's Claims for Negligence

The defendants move for summary judgment on James McKenna's claims that they were negligent for failing to properly select, screen, and train Lilholm. They contend that James McKenna has failed to demonstrate causation because he presents no evidence that the defendants' negligence proximately caused his injury.

In response, James McKenna has produced expert testimony from Dr. John F. Cusack of the Commonwealth Center for Consultation and Psychotherapy in Somerville, Massachusetts. Dr. Cusack opines that certain unspecified pieces of information that the

---

take a photograph.

[11] Defendants also argue that the release signed by Marsha McKenna acknowledges that the au pair provided by the defendants is not their employee or agent. I have already determined that Marsha McKenna's release of the defendants is unenforceable as to James's claims. Supra at III.A. The same reasoning defeats the argument that Marsha McKenna's agreement with the defendants estops James from arguing that Lilholm was the defendants' employee.

22

defendants could have learned about Lilholm's family, social, and sexual history should have indicated a need for more rigorous follow-up questioning.  Although there is no indication that more rigorous questioning would have revealed relevant information about Lilholm's propensity to commit improper sexual acts, Dr. Cusack ultimately concludes:

> to a reasonable degree of certainty that Au Pair in America's inadequacies in their screening, selection, orientation, training, and supervision of Mr. Lilholm amounted to a substantial cause of the Plaintiffs' harm.  If careful and proper procedures had been in place, in all likelihood Mr. Lilholm would not have been accepted or retained to care for children.

Dr. Cusack also concludes that "[p]roper orientation, training and supervision would have recognized and addressed the problems that surfaced in Mr. Lilholm's placement with the McKenna family."  It is unclear how Dr. Cusack reached his ultimate conclusions.  The defendants, however, have not moved to exclude Dr. Cusack's testimony pursuant to Fed. R. Evid. 702 or otherwise argued that his testimony is inadmissible.  As a result, Dr. Cusack's opinion must be given weight at this stage.  Based on his testimony, a reasonable jury could conclude that James's harm was a foreseeable consequence of the defendants' negligence and that the defendants' negligence was a substantial cause of

23

James's harm.[12]  Thus, I deny defendants' motion for summary judgment as to James McKenna's negligence claims.

## IV.  CONCLUSION

I grant defendants' motion for summary judgment (document no. 25) in part and deny it in part.  Defendants are awarded summary judgment with respect to Marsha McKenna's misrepresentation counts (Counts XVII and XVIII).

SO ORDERED.

 

 

_____
Paul Barbadoro
United States District Court

September 12, 1997

cc:  James C. Wheat, Esq.
     Peter G.  DeGelleke, Esq.

---

[12]  This evidence also distinguishes this case from <u>Doe v. Boys Clubs of Greater Dallas, Inc.</u>, 907 S.W.2d 472 (Tex. 1995), cited by the defendants.  In that case, "the plaintiffs' evidence did not raise a fact question concerning cause in fact or foreseeability."  <u>Id.</u> at 478.